# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DEREK LANDRY**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 09-7561**

**BURL CAIN**                                       **SECTION "S"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE.**

---

[1] Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

# I.   PROCEDURAL BACKGROUND

The petitioner, Derek Landry, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On November 17, 1994, an Orleans Parish grand jury indicted Landry for the first-degree murder of Lloyd Gonzales, Jr., during the perpetration or attempted perpetration of an armed robbery, a violation of La. R.S. 14:30.  Landry was tried by jury, convicted and sentenced to death.

On direct appeal, the Louisiana Supreme Court, in an opinion issued June 29, 1999, reversed Landry's conviction and sentence and remanded the matter for a new trial on the basis that the appellate record was "so deficient" the court could not properly review the case.  State v. Landry, 751 So.2d 214 (La. 1999).

In April 2003, the State re-tried Landry in Orleans Parish Criminal District Court.  Following a three-day trial, the jury convicted Landry of first-degree murder.  After he waived all delays, the court sentenced Landry on April 26, 2003, to life imprisonment pursuant to the jury's recommendation.

On May 19, 2004, the Louisiana Fourth Circuit Court of Appeal affirmed Landry's conviction and sentence.  State v. Landry, 876 So.2d 146 (La. App. 4 Cir. 2004).  On November 15, 2004, the Louisiana Supreme Court denied Landry's writ application.  State v. Landry, 887 So.2d 474 (La. 2004).

On November 3, 2005, Landry filed a <u>pro</u> <u>se</u> application for post-conviction relief with the state district court. (State rec., vol. 25 of 25). In August, 2008, Landry filed an application for writ of mandamus with the Louisiana Fourth Circuit Court of Appeal alleging that the district court had failed to rule on his post-conviction application. (State rec., vol. 25 of 25). On September 10, 2008, the state appellate court denied the writ based upon its finding that Landry had failed to demonstrate that his post-conviction application had been timely filed. <u>State v. Landry</u>, No. 2008-K-1032 (La. App. 4 Cir. Sept. 10, 2008) (unpublished decision) (State rec., vol. 25 of 25). In response, Landry filed a second mandamus application pursuant to which he provided proof that his post-conviction application was timely filed. (State rec., vol. 25 of 25). On October 21, 2008, the Louisiana Fourth Circuit reviewed the merits of Landry's post-conviction application and determined that he was not entitled to relief. <u>State v. Landry</u>, No. 2008-K-1204 (La. App. 4 Cir. Oct. 21, 2008) (unpublished decision) (State rec., vol. 25 of 25). On October 2, 2009, the Louisiana Supreme Court denied Landry's writ application. <u>State ex rel. Landry v. State</u>, 18 So.3d 109 (La. 2009).

On or about November 3, 2009, Landry filed the instant federal habeas corpus petition, raising the following claims: 1) He was indicted by an unconstitutionally empaneled grand jury; 2) The prosecution withheld exculpatory evidence and knowingly used false

3

and perjured testimony;[2] 3) His identification by Leora Gonzalez was unconstitutional;[3] 4) He was denied his right to present a defense by calling Herbert White as a witness on his behalf; and, 5) The trial court erred in limiting his cross-examination of Leora Gonzales. The State, in its Response (rec. doc. 8), does not contest the timeliness of the instant action or that Landry has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198 (1982). The State does, however, assert that Landry is procedurally barred from raising claim 3). The Court shall address Landry's claims, along with the State's assertion that one claim is procedurally barred, following its review of the pertinent facts and applicable standard of review.

## II.  **FACTS**[4]

At 7:15 p.m. on September 1, 1994, Officer James Daughtry and his partner, Officer Gordon Hyde, responded to a call of a shooting in the 4400 block of Annette Street. When the officers arrived at the scene, they found one victim, Lloyd Gonzales, Jr., lying in the front doorway of the residence, dead from an apparent gunshot wound to the left side of his face. The officers entered

---

[2]Claim 2), set forth above, represents a consolidation of Landry's claims 2 and 3.

[3]Claim 3), set forth above, represents a consolidation of Landry's claims 4 and 5.

[4]The facts set forth hereinafter are essentially the same as set forth by the appellate court in its ruling on Landry's direct appeal. State v. Landry, 876 So.2d 146 (La. App. 4th Cir. 2004).

the residence where they found another victim, Lloyd Gonzales, Sr., alive and suffering from an upper body gunshot wound. Officer Daughtry called for medical assistance, notified the homicide division and secured the scene. He spoke to Mrs. Leora Gonzales, the mother and wife, respectively, of the shooting victims, who described the shooter as a light skinned black male wearing plaid shorts, weighing approximately 155 pounds and standing 5'7" to 5'10" tall. Daughtry radioed dispatch with the description, and then canvassed the neighborhood for witnesses.

Detective Joseph Catalonotto led the investigation in this case. He arrived on the scene at approximately 8:00 p.m. Lloyd Gonzales, Jr. was dead in the front doorway. Catalonotto learned that Lloyd Gonzales, Sr. had been shot also and been transported to Charity Hospital. Catalonotto tried to speak to Mrs. Gonzales; however, she was very distraught. She described the assailant as a black male, medium build and 5'7" to 5'10" in height. Detective Catalonotto ordered the crime scene processed, including photographs, collection of blood samples, diagram of the premises, etc.

On September 6, 1994, Catalonotto compiled a photographic lineup, which Mrs. Gonzales viewed, but she was unable to identify the shooter. On September 9, 1994, Detective Catalonotto compiled a second photographic lineup, which Mr. and Mrs. Gonzales viewed separately. While Mrs. Gonzales made no identification from this

second photo lineup, she said she could identify the shooter if she saw him again. Mr. Gonzales, however, positively identified a picture of Landry as being the man who shot and killed his son. On October 13, 1994, NOPD officers arrested Landry for the first-degree murder of Lloyd Gonzales, Jr.

At trial, Mrs. Leora Gonzales recounted the day of the shooting, and testified that she returned home from visiting her mother at approximately 6:00 p.m. She gathered her belongings and exited her vehicle quickly because it was raining. As she did so, the defendant approached her. Thinking she recognized him as a neighbor, she slowed to greet him. As he came closer, however, Mrs. Gonzales realized she did not know the defendant and she became frightened. She ran to her front porch and screamed for help. The defendant followed her but slipped on the front steps, injuring his arm. Mrs. Gonzales ran to the side of the porch where she cowered in the corner. Just then, her son opened the front door. The defendant shot him. Mrs. Gonzales heard the defendant fire a second shot. At that point she curled into a fetal position and waited for the defendant to shoot her. Instead, the defendant grabbed her purse and fled on foot. Mrs. Gonzales embraced her wounded son. When she did, she heard her grandson crying in the house. She entered the house to comfort the child, and discovered her wounded husband. Mrs. Gonzales described her attacker to the police that night. She confirmed her inability to identify anyone from two

photographic lineups she viewed, but maintained that she told police she could identify the shooter if she saw him again. Prior to the defendant's first trial, Mrs. Gonzales identified the defendant in court as the man who shot her son and husband. She made the identification as the defendant and other prisoners clad in orange jumpsuits entered the courtroom for motion hearings.

Lloyd Gonzales, Sr. testified that he and his son Lloyd Gonzales, Jr., were at home babysitting a grandchild on the night of the shooting. Mr. Gonzales was upstairs tending the child, while Lloyd, Jr. watched television downstairs. At approximately 6:30 p.m., Mr. Gonzales heard his wife scream. As he descended the stairs, he heard a gunshot. He arrived at the front door and found Lloyd, Jr. dead in the doorway. Mr. Gonzales pushed the front door open and when he did, the defendant shot him in the chest. Because it was still daylight outside, Mr. Gonzales got a good look at the defendant. Mr. Gonzales went back inside and called the police. Following surgery and a six-day hospital stay, Mr. Gonzales returned home. Detective Catalonotto showed him a picture lineup from which Mr. Gonzales identified the defendant as the shooter. Mr. Gonzales recounted sitting in court with his wife in 1994 when she identified the defendant as her assailant and her son's killer. The defendant entered the courtroom with several other prisoners. Immediately upon seeing the defendant, Mrs. Gonzales identified him to Mr. Gonzales.

Dr. Susan Garcia, an Orleans Parish forensic pathologist, performed an autopsy on the body of Lloyd Gonzales, Jr. She testified that the victim died from a single gunshot wound to the left side of his face. The bullet severed the victim's brain stem, killing him instantly. Dr. Garcia opined that the killer delivered the fatal shot from a distance of ten to eighteen inches.

NOPD firearms expert Officer Kenneth Leary, Jr., compared the bullet recovered during the autopsy on the body of Lloyd Gonzales, Jr. to the bullet retrieved from surgery performed on Lloyd Gonzales, Sr. Officer Leary identified the bullets as .32 caliber, and concluded that the same gun fired both bullets.

**III. <u>STANDARD OF REVIEW</u>**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**IV. ANALYSIS**

**A. Unconstitutionally Empaneled Grand Jury**

Landry argues that he is entitled to federal habeas corpus relief because the grand jury which indicted him was selected in an

9

unconstitutional manner.  In support of his argument, Landry relies upon _State v. Dilosa_, 848 So.2d 546 (La. 2003), _Campbell v. Louisiana_, 523 U.S. 392 (1998), and _Wall v. Cain_, 316 Fed.Appx. 336 (5th Cir. 2009).  As shown below, Landry's reliance on these cases is misplaced.

In _Dilosa_, _supra_, the Louisiana Supreme Court determined that La. C. Cr. P. art. 413(C), which set forth the process for selection of grand juries in Orleans Parish at the time an Orleans Parish grand jury indicted Landry, failed to provide the procedural protections required by the Louisiana Constitution.  _Id_. at 546.[5] Federal habeas corpus relief, however, may be granted only when a petitioner has suffered a violation of his or her rights under the United States Constitution.  28 U.S.C. §2254; _Engle v. Isaac_, 456 U.S. 107, 119, (1982).  Because the constitutional rights addressed in _Dilosa_ were state constitutional rights, federal habeas corpus relief is not available to Landry.  _Davis v. Jones_, 2006 WL 1540114 at *2 n.11 (E.D. La. 2006).  As this Court noted in its Report and Recommendation issued in _Varnado v. Cain_, Civil Action 02-1286 c/w 03-753 and 03-754, doc. no. 28, p. 5 (E.D. La. Feb. 2, 2004), "_Dilosa_ affords [petitioner] no solace because it is axiomatic that federal

---

[5]La.C.Cr.P. art. 413(C), prior to its repeal by Acts 2001, No. 281, §§1,2, provided:

> In the parish of Orleans, the court shall select twelve persons plus a first and second alternate for a total of fourteen persons from the grand jury venire, who shall constitute the grand jury. The court shall thereupon select one of the jurors to serve as foreman.

habeas relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice."

Similarly, <u>Campbell</u> and <u>Wall</u>, <u>supra</u>, afford Landry no relief. Both cases concern the constitutionality of La. Code Crim. P. art. 413(B), rather than art. 413(C). La. Code Crim. P. art. 413(B) provided:

> In parishes <u>other than Orleans</u>, <u>the court shall select one person from the grand jury venire to serve as foreman of the grand jury</u>. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury.

La. Code Crim. Proc. art. 413(B) (emphasis added) (prior to amendment by Acts 1999, No. 984, § 1, approved July 9, 1999). Thus, under the pre-July 1999 law in Louisiana,

> the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot. . . . As a result, when the Louisiana judge selected the foreperson, he also selected one member of the grand jury outside of the drawing system used to compose the balance of that body. These considerations require us to treat the case as one alleging discriminatory selection of grand jurors.

<u>Campbell</u>, 523 U.S. at 396. The Louisiana legislature amended Article 413(B) in July 1999 to delete the emphasized language in the quotation above and to provide instead for random selection of the

foreperson from among the already impaneled grand jury members. La. Code Crim. Proc. art. 413(B) (as amended by Acts 1999, No. 984, §1).[6]

Though the <u>Campbell</u> reasoning, along with the <u>Wall</u> decision, is informative when addressing Landry's claim, the holding of both <u>Campbell</u> and <u>Wall</u> addressed a statute which was not the basis of Landry's grand jury selection process in Orleans Parish under La. Code Crim. P. art. 413(C). In fact, the United States Supreme Court has not addressed the issue of the constitutionality of Article 413(C). Rather, as set forth above, it was the Louisiana Supreme Court, in <u>Dilosa</u>, <u>supra</u>, which addressed the propriety of Article 413(C), and Landry's claim, based upon <u>Dilosa</u>, that Article 413(C) violated the state constitution is not a ground for federal habeas corpus relief.

Further, even if Article 413(B), rather than Article 413(C), was at issue, Landry would nevertheless not be entitled to habeas relief. As set forth in <u>Rideau v. Whitley</u>, 237 F.3d 472, 484-485 (5th Cir. 2000) (citing <u>Rose v. Mitchell</u>, 443 U.S. 545, 565 (1979)), "to be entitled to habeas relief [in a case alleging unconstitutional grand jury selection,] a claimant is required to <u>prove discrimination</u> under the standards set out in the Supreme Court's cases. [Emphasis added.]". The Supreme Court in <u>Campbell</u>, 523 U.S. at 396, emphasized that the criminal defendant must show, as a precondition to raising

---

[6]The 1999 amendment applied to all parishes <u>other than Orleans Parish</u>. The article was amended again in 2001 to delete the exceptions for Orleans Parish. Acts 2001, No. 281, § 1.

a third-party due process or equal protection challenge, that he suffered an "injury in fact" from the exclusion of African-Americans from the grand jury. The Court explained:

> Regardless of his or her skin color, the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination. Discrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system because the grand jury is a central component of the criminal justice process.

Id. at 398 (quotation omitted). Furthermore, "[t]o assert the rights of those venirepersons who were excluded from serving on the grand jury in his case, [petitioner] must prove their exclusion was on account of intentional discrimination." Id.

In the instant case, Landry has not demonstrated any race or gender[7] discrimination in the selection of the foreperson of the grand jury that indicted him. In connection with this claim, Landry has not submitted any documentation or other evidentiary support for his claim. Accordingly, the instant claim for federal habeas corpus relief should be denied.

**B. Prosecution Withheld Exculpatory Evidence in Violation of Brady and Knowingly Used False Evidence**

---

[7]The United States Supreme Court ruled long ago that exclusion of women from a federal grand jury panel was unconstitutional. Ballard v. United States, 329 U.S. 187, 195-96 (1946); see also J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994) (gender-based peremptory challenges to petit jurors violate the Constitution).

In order to establish a due process violation under the precepts of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), a petitioner must show that: 1) The state withheld evidence, 2) the evidence is favorable to the defense because it is exculpatory or impeaching, and 3) the evidence is material to guilt or punishment. <u>Brady</u>, 373 U.S. at 87. Materiality is established if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). A "reasonable probability" exists when suppression of the evidence "... undermines confidence in the outcome of the trial." <u>Id</u>. at 678. A <u>Brady</u> violation is established upon a showing "... that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995)(footnote omitted). This is so because "... the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." <u>Id</u>. at 436-37. In determining whether evidence is material for <u>Brady</u> purposes, the Court must consider the cumulative effect of all the suppressed evidence rather than ruling on each item individually. <u>Id</u>.

Having set forth the pronouncements of <u>Brady</u> and its progeny, the Court now turns to Landry's specific claims. First, Landry contends that the State, in violation of <u>Brady</u>, withheld Lloyd

Gonzales Sr.'s hospital records which Landry contends were significant because they reveal that Detective Catalanotto and Lloyd Gonzales lied about when Gonzales made a photographic identification of Landry. According to Landry, the hospital records reflect that Gonzales was still in the hospital on September 9, 1994, and, therefore, contrary to both Catalonotto's testimony and Gonzales's testimony, Gonzales could not have viewed a photographic lineup at his home on September 9, 1994, and identified Landry as the person who shot him. Further, Landry contends that the state, by virtue of its knowledge of the hospital records, knew that Detective Catalonotto could not have provided Mr. Gonzales with a photographic lineup at Gonzales's home on September 9, 1994, yet the state allowed both Catalonotto and Lloyd Gonzales, Sr., to falsely inform jurors that such an identification took place.

Landry's argument is without merit for the following reasons. First, there is evidence reflecting that Gonzales's medical records were not withheld, but rather, were received by the defense long before Landry's second trial in April, 2003. Landry's defense counsel, Stephen Singer, acknowledged his receipt of medical records on "04/28/00".[8] Thereafter, on September 27, 2000, defense counsel

---

[8] State rec., vol. 12 of 25, p. 440.

filed with the state district court a "Motion to Exclude the Medical Records of Lloyd Gonzales, Sr.".[9]

Second, a review of Mr. Gonzales's medical records reveals that he was admitted into the hospital on September 1, 1994, and he testified that he remained hospitalized for six days.

Q. [H]ow long were you in the hospital, Mr. Gonzales?

A. I was taken to the emergency at Charity Hospital for three days, then I was transferred to the University Hospital....

Q. And how long were you at University Hospital?

A. I think another three days.

Q. And then you went home?

A. Yes.[10]

Accordingly, Detective Catalonotto's testimony and Mr. Gonzales's testimony to the effect that Mr. Gonzales, on September 9, 1994, examined, at his home, a photographic lineup provided by Detective Catalonotto and positively identified Landry as the man who shot him, was not contrary to Gonzales's medical records. Therefore, said medical records did not constitute impeachment material and there is no evidence to suggest that Detective Catalonotto and Mr. Gonzales

---

[9]State rec., vol. 17 of 25, pp. 1017-1020.

[10]State rec., vol. 22 of 25, pp. 1930-1931.

were lying when they testified that the photographic identification took place at Mr. Gonzales's home on September 9, 1994.[11]

Next, Landry contends that the State, in violation of <u>Brady</u>, withheld the contents of the 911 call which Leora Gonzales placed at the time of the murder. In the 911 call, the perpetrator is described as wearing a hat.[12] In her trial testimony, Mrs. Gonzales described the perpetrator as having a neat, short haircut.[13] Landry argues that because she made no mention of a hat in her trial testimony, the 911 transcript, had it been provided to the defense, could have been used to impeach Leora Gonzales's testimony. As such, its non-disclosure, according to Landry, constitutes a <u>Brady</u> violation. For the following reasons, the Court finds Landry's argument to be without merit.

First, the 911 transcript could not have properly been used to impeach Leora Gonzales's trial testimony because Mrs. Gonzales did

---

[11]In support of his argument, Landry points to the "Discharge Summary" prepared by Dr. Champagne with regard to his treatment of Lloyd Gonzales. (A copy of the pertinent discharge summary is contained in the State rec., vol. 12 of 25, p. 477). Specifically, Landry relies on the notation, "DD: 10-18-94 DT: 10-19-94". However, the Court takes judicial notice of the fact, based upon its review of numerous medical records, that "DD" refers to the date the discharge summary was dictated and "DT" refers to the date the discharge summary was transcribed. These dates do not represent Mr. Gonzales's hospital discharge date.

[12]The transcript of the 911 call is attached to Landry's habeas application as Exhibit B.

[13]State rec., vol. 22 of 25, p. 1902.

not place the 911 call and describe the perpetrator as wearing a hat. Mr. Gonzales placed the 911 call.[14]

Second, as noted above, to constitute a <u>Brady</u> violation, the evidence must be such that its suppression "undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678. The fact that Mr. Gonzales, in his 911 call, described the perpetrator as wearing a hat; whereas, his wife, at trial, described the perpetrator as having neat, short hair, does not necessarily negate the fact that the perpetrator was wearing a hat. The two descriptions are not mutually exclusive. Further, such a minor discrepancy does not "undermine confidence" in the jury's guilty verdict given Mr. Gonzales's strong, positive identification, both in a photographic lineup and at trial, that Landry was the man who murdered his son and shot him in the chest.[15]

### C. Unconstitutional Identification by Leora Gonzales

Landry argues that Leora Gonzales's identification of him was unconstitutional because it was impermissibly suggestive and was made outside the presence of Landry's counsel. Specifically, the identification to which Landry objects was made by Leora Gonzales at

---

[14]<u>See</u> State rec., vol. 22 of 25, p. 1928; <u>see</u> <u>also</u> discussion <u>supra</u> at p. 7.

[15]Additionally, there is evidence to suggest that the 911 transcript was not withheld, but rather, was provided to the defense long before Landry's second trial in 2003. While the exact date the transcript was released to the defense is not clear, the 911 transcript is contained in the State rec., vol. 14 of 25, p. 519, along with pleadings submitted in 2000.

a December 1994 pre-trial motion hearing. The circumstances surrounding this identification, as described by the Louisiana Fourth Circuit, are as follows:

> While sitting in court awaiting the beginning of the proceedings, Mrs. Gonzales noticed the defendant, clad in an orange jumpsuit, enter the courtroom in the company of several other men in the same clothing. As soon as Mrs. Gonzales saw the defendant, she identified him to her husband as the man who killed their son and stole her purse.

_Landry_, 876 So.2d at 151.

In addressing Landry's challenge to Leora Gonzales's identification, the state appellate court provided:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence. La.C.Cr.P. art. 841. The contemporaneous objection rule prevents "a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings. _State v. Taylor_, 93-2201 p.7 (La. 2/28/96), 669 So.2d 364, 368-69 (citing _State v. Arvie_, 505 So.2d 44, 47 (La. 1987)). In this case, the defendant has not shown that he lodged a contemporaneous objection to Mrs. Gonzales' in-court or out-of-court identifications of him at either the December 1994 hearing or at the April 24, 2003 trial. As such, the issue has not been preserved for review on appeal.

_Landry_, 876 So.2d at 151.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. _Coleman v. Thompson_,

501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Harris, 489 U.S. at 263; Glover, 128 F.3d at 902. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In the instant matter, the state appellate court issued the last reasoned opinion, denying Landry's challenge to Leora Gonzales's identification based upon Landry's failure to object, citing La.C.Cr.P. art 841 and related state case law. Alternatively, the Louisiana Fourth Circuit determined that Landry's challenge to Leora Gonzales's identification was without merit. See Landry, 876 So.2d at 151-152. However, the United States Fifth Circuit has held that "[a] state court expressly and unambiguously bases its denial of

20

relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." <u>Fisher v. Texas</u>, 169 F.3d 295, 300 (5th Cir. 1999).

It is well-settled that Louisiana's contemporaneous objection rule is an independent and adequate state procedural ground, regularly applied by the Louisiana courts. <u>Duncan v. Cain</u>, 278 F.3d 537, 541 (5th Cir. 2002) (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87-88 (1977)); <u>Marshall v. Cain</u>, 2006 WL 2414073 (E.D. La. Aug. 18, 2006) (Zainey, J.). When the state court relies on this procedural default in dismissing a claim, as it did here, the claim is generally barred from federal habeas review. <u>Duncan</u>, 278 F.3d at 541; <u>Riles v. McCotter</u>, 799 F.2d 947, 953 (5th Cir. 1986) (challenge to state's expert was procedurally barred from federal habeas review where state applied procedural default for failure to object at trial).

In this instant matter, however, the court finds that Landry's failure to object to Mrs. Gonzales's identification at trial was not necessarily attributable to any default on Landry's part, for which he should face a procedural bar. Instead, Landry's failure to object at trial was likely attributable to a belief that such an objection would be futile.

Landry first objected to the admission of Mrs. Gonzales's December 1994 identification in pre-trial motion practice. When the trial court denied Landry's pre-trial motion to exclude Gonzales's

21

identification from evidence, Landry filed a writ application with the Louisiana Fourth Circuit Court of Appeal. On February 3, 2003, the state appellate court denied Landry's writ application on the basis that Landry had "an adequate remedy on appeal." State v. Landry, No. 2003-K-0133 (La. App. 4 Cir. Feb. 3, 2003) (unpublished opinion).[16] Thereafter, Landry raised the issue before the Louisiana Supreme Court. On March 28, 2003, the state supreme court likewise denied Landry's writ application. State v. Landry, 840 So.2d 581 (La. 2003).

Given Landry's strenuous pre-trial objection to Mrs. Gonzales's identification, the Court finds that Landry had good cause not to reiterate his objection at trial. Such an objection, given the trial court's adverse pre-trial ruling, likely would have been futile. Accordingly, the Court shall address the merits of Landry's claim that his constitutional rights were violated by virtue of the trial court's admission of Mrs. Gonzales's December 1994 identification of Landry as the man who killed her son and stole her purse.[17]

---

[16]A copy of the state appellate court's unpublished February 3, 2003 decision is contained in the State rec., vol. 8 of 25.

[17]Landry filed with this Court a Motion for Summary Judgment (rec. doc. 11) pursuant to which he argues that he should be relieved from having to abide by state procedural rules and, therefore, he is entitled to federal habeas review of his claim that Mrs. Gonzales's December 1994 identification should not have been admitted into evidence. In light of the Court's determination that it will review the merits of the instant claim, Landry's Motion for Summary Judgment should be denied as moot.

As stated earlier, despite its finding that the instant claim was procedurally barred, the Louisiana Fourth Circuit Court of Appeal, alternatively, addressed the merits of Landry's argument that Mrs. Gonzales's identification should have been suppressed because it was impermissibly suggestive and was provided outside the presence of counsel.[18]  The state appellate court first noted that the 1994 identification could not be properly characterized as a formal identification procedure.

> Rather, the identification was more in the nature of a show up.  Mr. and Mrs. Gonzales sat in court for a previous phase of this case.  Mrs. Gonzales saw the defendant enter the courtroom through the portal used for such purpose and looked to see if she saw her son's killer. Her interest stemmed from curiosity, not pursuant to any formal procedure.  There is no evidence that Ms. Gonzales was subpoenaed to come to court in hopes that she would see the defendant in the courtroom and identify him as the murderer.  This was not an arranged identification procedure, but <u>an inadvertent meeting between the witness and the defendant</u>.

Landry, 876 So.2d at 151 (emphasis added).

The Louisiana Fourth Circuit next reasoned that even if the above-described encounter could be classified as an identification "proceeding", Landry failed to show that the proceeding was unduly suggestive.

> Admittedly, the defendant was identified as a prisoner; however, he was one of several prisoners, all wearing identical clothing.  There is nothing to indicate that any features such as race, height or physical markings drew

---

[18]See supra at n.15.

23

undue focus on him vis-a-vis the other men. Neither did
the defendant enter the courtroom alone. Mrs. Gonzales
noted that the defendant was "the second or third" man in
the group of prisoners. These facts do not support the
defendant's assertion that Mrs. Gonzales's attention was
unduly focused upon him.

Id. at 152.

Finally, the state appellate court reasoned that even if

Landry could prove that Mrs. Gonzales's December 1994 identification

was unduly suggestive, he would still have the burden of showing that

there was a substantial likelihood of misidentification as a result

of the suggestive identification.

The Supreme Court held in Manson v. Brathwaite, 432 U.S.
98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that
despite the existence of a suggestive pretrial
identification, an identification may be permissible if
there does not exist a "very substantial likelihood of
irreparable misidentification." Under Manson, the factors
which courts must examine to determine, for the totality
of the circumstances, whether the suggestiveness presents
a substantial likelihood of misidentification include: 1)
the witness' opportunity to view the criminal at the time
of the crime; 2) the witness' degree of attention; 3) the
accuracy of his prior description of the criminal; 4) the
level of certainty demonstrated at the confrontation; and
5)the time between the crime and the confrontation.  Id.

Landry, 876 So.2d at 152.

Applying the above factors to the applicable facts, the

court concluded that Landry failed to show that there was a "very

substantial likelihood of irreparable misidentification", reasoning:

In this case, Mrs. Gonzales testified that there was
plenty of daylight for her to see the defendant.  She
noticed his eyes and his movements and stated that he was

24

clean cut and neat. Mrs. Gonzales consistently maintained that she could identify her attacker if she physically saw him again and never wavered from her estimation of his height as 5'7" to 5'10". Moreover, she looked her assailant in the eye for at least fifteen seconds, and emphasized that she would never forget his face.

Id.

This Court finds that the above represents a reasonable application of the law enunciated by the Supreme Court in Manson, supra, to the facts of this case. Accordingly, Landry's claim that he is entitled to habeas corpus relief because Mrs. Gonzales's identification was unduly suggestive is without merit.

Regarding Landry's complaint that Gonzales's identification was made outside the presence of counsel, in United States v. Wade, 388 U.S. 218 (1967), the Court determined that a post-indictment identification proceeding at which the accused is exhibited to an identifying witness is "a critical stage of the criminal prosecution" and, as such, must generally be conducted in the presence of counsel. Schneckloth v. Bustamonte, 412 U.S. 218, 239 (1973) (quotation omitted). However, as the Louisiana Fourth Circuit noted in rejecting the instant claim, the "Wade rule" "does not apply to a chance encounter between a witness and the accused", such as the unplanned encounter between Gonzales and Landry at the December 1994 pre-trial proceeding. Landry, 876 So.2d at 152. See also United States v. Furtney, 351 F.Supp. 671, 673 (W.D. Pa. Nov. 9, 1972) ("chance encounter between Tomsic [the witness] and the defendant was

not a lineup in violation of the <u>Wade</u> rule; it was not a critical confrontation intentionally arranged by the prosecuting authorities."); <u>United States v. Colclough</u>, 549 F.2d 937, 941-942 (4th Cir. 1977) (where confrontation between witness and accused was not planned, it generally will not be deemed violative of the due process rule against an unduly suggestive confrontation justifying an inference of irreparable mistaken identification).

Accordingly, this Court finds that the Louisiana Fourth Circuit's rejection of Landry's claim does not represent an unreasonable application of the rule enunciated in <u>Wade</u>, <u>supra</u>, to the facts of this case. As such, Landry's claim that he is entitled to habeas corpus relief because Gonzales's identification was made outside the presence of counsel is without merit.

**D. Denial of His Right to Present a Defense**

Landry argues that he was denied his constitutional right to present a defense when the trial court refused to grant a continuance of the trial when defense witness, Herbert White, an alleged eyewitness to the murder, failed to appear for trial. According to Landry, White's testimony was crucial because White allegedly would have testified that he was present at the murder scene and could not identify Landry as the perpetrator.

Landry raised this same claim in connection with his direct appeal. In rejecting said claim, the Louisiana Fourth Circuit first

noted that there was no evidence that Landry "moved for a continuance on the day of trial." Landry, 876 So.2d at 152. Specifically, "[t]here was a motion for continuance made the morning of voir dire, the day before trial; however, there are no reasons given for the motion or its denial." Id.[19] Further, "[t]here is no indication Mr. White was subpoenaed or that the substance of his alleged testimony was proffered for the record." Landry, 876 So.2d at 152-153.

Following the above observations, the state appellate court examined Landry's burden of proof, providing, in part:

> In order to show prejudicial error sufficient to warrant reversal, the defendant must show that the testimony the witness would have given would have been favorable to the defense and would indicate the possibility of a different result. State v. Stevenson, 02-0079 (La. App. 5 Cir. 4/30/02), 817 So.2d 343.

Landry, 876 So.2d at 153.

The above state law essentially mirrors applicable federal law which provides that a habeas petitioner must show that a trial court's denial of a continuance in order to procure the testimony of a defense witness rendered petitioner's trial fundamentally unfair. See Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. 1981) ("When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion

---

[19]A review of the State record reflects that three days before Landry's scheduled trial on March 19, 2003, a written motion for a continuance jointly filed by the state and the defense was granted by the court. By virtue of the court's action in this regard, both sides obtained an additional month to better prepare for trial.

but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process."); Conner v. Bowen, 842 F.2d 279, 283 (11th Cir.), cert. denied, 488 U.S. 840 (1988) (issue to be resolved is whether the denial of a continuance deprived petitioner of a fair trial); Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (denial of continuance must be so arbitrary as to violate due process).

In the instant matter, Landry has clearly failed to satisfy his burden of proof. First, as the Louisiana Fourth Circuit noted, there is no evidence that Landry ever issued a subpoena to procure Mr. White's testimony and White's alleged testimony was not proffered for the record.

Second, the exculpatory nature of White's alleged testimony is questionable. Landry does not contend that White would have offered testimony to the effect that Landry did not murder Lloyd Gonzales, Jr. Instead, White would simply have stated that he was at the scene of the murder and he could not identify the perpetrator.

### E. Trial Court Erred in Limiting Cross-Examination of Leora Gonzales

Landry argues that the trial court erred in limiting his cross-examination of Leora Gonzales. Landry points to the fact that Leora Gonzales, in Landry's second trial, stated that the perpetrator, in the course of committing the crime at issue, injured his arm, suffering a brush burn. Landry contends that the trial

court erred in not allowing defense counsel to aggressively cross-examine Mrs. Gonzales with regard to her failure to earlier inform that the perpetrator had injured his arm. Landry also complains that the court erred in limiting defense counsel's cross-examination of Mrs. Gonzales with respect to her testimony about the height of the perpetrator and the level at which the perpetrator held his gun when he shot her son.

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding. _Burgett v. Texas_, 389 U.S. 109, 113-14 (1967). As long as the evidentiary ruling is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted. _Id_. _See_ _also_ _Robinson v. Whitley_, 2 F.3d 562, 566 (5th Cir. 1993), _cert._ _denied_, 510 U.S. 1167 (1994).

In reviewing Landry's claim that the trial court's rulings, in connection with defense counsel's cross-examination of Leora Gonzales, were in error, the state appellate court first examined applicable law.

> An accused is entitled to confront and cross-examine the witnesses against him. La. Const. Art. 1, §16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross-examination of the State's witnesses. _State v. Van Winkle_, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has discretion to control the extent of the examination of witnesses as long as the court does not deprive the

defendant of his right to effective cross-examination.
<u>State v. Hawkins</u>, 96-0766 (La.1/14/97), 688 So.2d 473;
<u>State v. Huckabay</u>, 2000-1082 (La.App. 4 Cir. 2/6/02),
809 So.2d 1093, <u>writ den</u>., 2002-0703 (La.11/1/02), 828
So.2d 564.  Evidentiary rules may not supercede the
fundamental right to present a defense.  <u>Id</u>.  However,
evidence may be excluded if it is irrelevant.  <u>See</u> <u>State</u>
<u>v. Casey</u>, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d
1022, 1037.  La. C.E. art. 403 provides that relevant
evidence may be excluded "if its probative value is
substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or waste of
time."  The Article 403 balancing test may exclude a
statement otherwise admissible as impeachment evidence.

Further, confrontation errors are subject to the
harmless error analysis so the verdict may stand if the
reviewing court determines that the guilty verdict
rendered in the particular trial was surely
unattributable to the error.  <u>State v. Broadway</u>, 96-
2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.

<u>Landry</u>, 876 So.2d at 150.

Thereafter, the Louisiana Fourth Circuit reviewed the

pertinent portion of defense counsel's cross-examination of Leora

Gonzales and the basis of the State's objection to the cross-

examination.

The State objected to the defense questioning Mrs.
Gonzales with regard to whether she testified about a
brush burn on the defendant's arm during the first
trial.  The State argued that the defense was attempting
to improperly impeach Mrs. Gonzales by showing that she
had not testified about the brush burn at the 1995
trial.

At the retrial the court held an in-chambers
conference to review pertinent testimony from the
defendant's first trial.  It did not show that defense
counsel ever posed a question about the brush burn to
Mrs. Gonzales during the 1995 trial.  The trial court's
ruling did not force the defense to abandon a proper

30

line of inquiry, because there was no prior inconsistent
statement with which the defense could impeach Mrs.
Gonzales in this trial.  Neither is there any merit to
the defendant's assertions about being denied the
opportunity to question Mrs. Gonzales regarding the
shooter's height and the level of his hand when he shot
the deceased.  In response to defense questioning, Mrs.
Gonzales testified that the shooter was 5'7" to 5'10"
tall and that he held the gun "sort of waist [level]"
when he shot her son.

Landry, 876 So.2d at 150.

A review of the trial transcript reflects that with

respect to defense counsel's cross-examination regarding the

perpetrator's brush burn, defense counsel was not impeded from

impeaching Mrs. Gonzales by questioning her about the fact that

she made no mention of a brush burn when she reported the murder

to police.  Mrs. Gonzales "opened the door" to such questioning

when, as shown below, she stated that on the night of the murder

she informed police that the perpetrator fell and injured his arm.

[MR. DOSKEY, DEFENSE COUNSEL:]

Q.  Okay.  That night, then, you don't remember
saying anything about the man falling, do you?  That
night?

A.  Yes, I'm sure I did.

Q.  You're sure -

A.  I explained what happened.

Q.  So, you're sure that you said that to the
policeman that night?[20]

At that point, the prosecutor objected, the trial court overruled

the objection, and the following exchange ensued.


    CROSS-EXAMINATION BY MR. DOSKEY:
        Q.  On September 21st, you sat down and gave a long
    tape-recorded interview to the police?


        A.  Yes.


        Q.  You didn't tell them the man had injured his
    arm -
        ....


    MS. TERMINE [PROSECUTOR]:
        Same objection, Your Honor.
        ....


    THE COURT:
        The objection is overruled.  Go ahead, continue.


    CROSS-EXAMINATION BY MR. DOSKEY:
        Q.  You didn't tell the police at that time, did
    you?


        A.  I don't know.


        Q.  Let me show you what I'll mark as, I believe,
    Defense Exhibit 3 for identification purposes....  Ma'am
    , can you take a look at that, take a second to look at
    that and see if that is in fact a transcription of the
    statement that you gave on September 21st?

_____

        [20]State rec., vol. 22 of 25, pp. 1891-1892.

A.  (The witness examines the exhibit.)  It seems-
it seems to have been.  Yeah, this is probably what I
said.

Q.  Okay.  Could you look at it and tell me if
anywhere in there you told the police that the man was
either leaning on his arm or had injured his arm?

A.  Maybe it's not but I remember that, I
remembered, I'm telling it to you now.

Q.  Could you look at that statement, ma'am, and
tell me?

....

THE WITNESS:

(The witness examines the exhibit.)  It might not
be on this statement because everything that happened
that I - well, went on tape, I did not necessarily
remember every little detail.  There's sometimes you -
you sleep on things and then you remember something else
and then you - that didn't get on tape.  I don't know
how it is with you, but sometimes you just can't
remember everything.  And it wasn't stressed the
importance of my telling every, every little detail.  If
I identified the man, what does it matter if he hurt a
little finger or scratched his arm or hit his chin?  I
just say I saw him - I saw him on the ground, . . . he
fell.  And he was struggling to get up.  So, maybe I did
not say it in here.

CROSS-EXAMINATION BY MR. DOSKEY:

Q.  Would you please read it and tell us whether
you did?

A.  It doesn't seem to be here, but just because
it's omitted and I didn't say it that night doesn't mean
it didn't happen.[21]

---

[21]State rec., vol. 22 of 25, pp. 1894-1896.

Defense counsel's cross-examination was limited, as the Louisiana Fourth Circuit explained, only when counsel attempted to impeach Mrs. Gonzales with the fact that she did not mention the brush burn in connection with her testimony during Landry's first trial. The state district court properly did not allow such questioning because, as reflected in the trial transcript, Mrs. Gonzales never stated that she had offered testimony, during Landry's first trial, to the effect that the perpetrator injured his arm in the course of murdering her son. Instead, she advised that she could not remember what she had stated during the first trial. Accordingly, the trial court properly did not allow defense counsel to proceed because there was no basis upon which to impeach Mrs. Gonzales.[22]

With respect to defense counsel's cross-examination of Mrs. Gonzales regarding the height of the perpetrator, a review of the trial transcript reflects that no limitation was placed upon said questioning, the trial court overruled the State's objection.

Q. [Your husband is] five-seven, correct?

MS. TERMINE:
    I'm going to object to that, Your Honor.

THE WITNESS:
    I don't understand what -

---

[22]See State rec., vol. 22 of 25, pp. 1896-1902.

THE COURT:

    I'm going to permit –

THE WITNESS:

    – my husband has – height has to do with it.  If he –

THE COURT:

    Okay.  If she knows the answer.

EXAMINATION BY MR. DOSKEY:

Q.  Do you know how tall he is?

A.  He shrunk like I have, maybe, but he was five-eight at one time.

Q.  Okay.  Now, you described the man to the police that night as being five-foot-seven to five-foot-ten, did you not?

A.  Well, yes, five-seven.

Q.  To five-ten?  Correct?

A.  I don't remember.

Q.  And that would have been – if five-ten, that would have been taller than your husband, correct?

A.  But I didn't say five-ten.  I said – I must have said five-seven to five-ten, in between.

Q.  All right.  The same height or taller than your husband ....[23]

_____

[23]State rec., vol. 22 of 25, pp. 1890-1891.

As for defense counsel's cross-examination of Mrs. Gonzales regarding the level at which the perpetrator held his gun when he shot the victim, said questioning was only interrupted, via the State's sustained objection, when defense counsel continued to question the witness after she stated that she could not remember.

    Q.   Could you stand up for us and show me the position that the gunman was in when he fired that shot?

    MS. TERMINE:

        I'm going to object, Your Honor. In relation to what?

EXAMINATION BY MR. DOSKEY:

    Q.  Just the stance that he was in, how his arms and his legs were at the time that he shot?

    THE COURT:

        If you recall that, ma'am, you can . . . do that. Do you remember?

    THE WITNESS:

        He was standing up, he wasn't -

CROSS-EXAMINATION BY MR. DOSKEY:

    Q.  I realize that, ma'am. Could you demonstrate for us?

    A.  He stood up (indicating) like that and shot him.

    Q.  And he put his hand out like that (indicating)?

    A.  Yes.

Q. Okay. At what level did he have his hand when he shot at your son?

MS. TERMINE:

I'm going to object, Your Honor.

THE COURT:

If you recall, if you recall, ma'am, you can answer that.

THE WITNESS:

I - I couldn't tell you exactly.

CROSS-EXAMINATION BY MR. DOSKEY:

Q. I'm not asking exactly. Was it waist level or chest level or -

A. Yeah, sort of waist -

MS. TERMINE:

Objection, Your Honor. She told you - she's already stated -

THE COURT:

Objection sustained.

THE WITNESS:

Well, I just don't remember exactly.[24]

Landry argues that the alleged restrictions placed upon defense counsel's cross-examination of Leora Gonzales deprived him of his constitutional rights since "[t]he State's case against [him] rested solely on the testimony of the eyewitness and [i]n particular

---

[24]State rec., vol. 22 of 25, pp. 1904-1905.

that of Mrs. Gonzales." (Rec. doc. 1, Landry's supporting memorandum, p. 41). However, Landry is mistaken in this regard. As the Louisiana Fourth Circuit observed:

> Mr. Gonzales unequivocally identified the defendant as the shooter. He testified that the outside light afforded him ample visibility of the defendant. Moreover, Mr. Gonzales said he looked into the defendant's eyes for approximately ten to fifteen seconds, long enough to eliminate all possibility of misidentification. Considering the evidence of the defendant's guilt, the jury's verdict was not attributable to any error by the trial court.

Landry, 876 So.2d at 150-151.

Based upon the above, the Court finds that Landry suffered no constitutional violation by virtue of the state trial court's rulings in connection with defense counsel's cross-examination of Leora Gonzales. Accordingly, Landry's claim for habeas corpus relief is without merit.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the petition of Derek Landry for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE**.[25]

---

[25]In connection with the instant habeas petition, the State submitted to this Court a State court record which purportedly consisted of 25 volumes. One of these volumes, volume 20, however, was empty. The State has advised the Court that it is unable to locate volume 20 which comprises "one (1) volume of the petitioner's direct state appeal in the Louisiana Fourth Circuit Court of Appeal". (Rec. doc. 12).

It is further **RECOMMENDED** that the motion for summary judgment filed by Derek Landry be **DENIED** as moot.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[26]

New Orleans, Louisiana, this <u>16th</u> day of <u>September</u>, 2010.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[26]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.